IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN COLTRANE THOMPSON and<br>NICHOLAS STEPHEN MCCLAIN,<br><br>Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 1:04-CR-148 TC |

Defendants John Coltrane Thompson and Nicholas Stephen McClain have been indicted on charges of possession of a firearm by a user of a controlled substance (18 U.S.C. § 922(g)(3)) and possession of a controlled substance with intent to distribute (21 U.S.C. § 841(a)(1)). In addition, Defendant Nicholas McClain has been indicted on a charge of felon in possession of a firearm (18 U.S.C. § 922(g)(1)). Both Defendants have filed motions to suppress evidence obtained in connection with a police officer's July 16, 2004 stop and warrantless search of a pickup truck, and his detention, search, and questioning of the Defendants (who were the driver and the passenger of the truck).

Mr. McClain, the driver of the pickup truck, filed a Motion to Suppress evidence obtained (including statements he made to law enforcement) during the warrantless search of Mr. McClain's person and the truck. He contends that the evidence must be excluded because the police officer's detention of Mr. McClain exceeded the scope of the initial traffic stop and Mr.

McClain's consent to search the truck was not voluntary.

Mr. Thompson, a passenger in the truck, filed a series of motions to suppress: Motion to Suppress Statements Pursuant to *Miranda*, Motion and Memorandum to Suppress [Evidence Obtained During] Automobile Search, Motion to Suppress Evidence Pursuant to *Terry v. Ohio*, and Motion to Exclude Use of Data From the Uninsured Motorist Identification Database Program. He also joins in Mr. McClain's Motion to Suppress. (See Mem. of Law in Support of Def.'s Mot. to Suppress (Docket No. 59) at 1, 8.) Primarily, Mr. Thompson contends that the evidence must be excluded because the officer's initiation of the traffic stop was not justified at its inception, Mr. Thompson's statements were obtained by the officer in violation of Mr. Thompson's *Miranda* rights, and the officer's request to search the truck (and the subsequent search) exceeded the scope of the stop and the officer's authority.

For the reasons discussed below, the court GRANTS the Defendants' Motions to Suppress, with the exception of Mr. Thompson's Motion to Exclude Use of Data From the Uninsured Motorist Identification Database Program, which is DENIED.

## FINDINGS OF FACT

On the afternoon of July 16, 2004, Deputy Todd Taylor of the Davis County Sheriff's Department was on patrol duty in the City of Layton. While waiting in his patrol car at a red light, he noticed an older model pickup truck pull behind him and stop. The front of the pickup truck, including the headlights, had been painted over with red spray paint. According to Deputy Taylor, the headlights "were pretty much covered. . . . [Y]ou could see the inside workings of the headlight. It was almost like the paint had turned pink. So it was almost translucent. However, it would still interfere with the headlights." (Transcript of Jan. 26, 2005 Evidentiary Hearing

2

(hereinafter "Tr.") at 7.)  At that point, Deputy Taylor believed that the paint on the truck's

headlights was a safety violation.  He entered the truck's license plate number into a computer

mounted in the front seat of his car.

The computer was linked to Davis County dispatch and the state computer system, and

provided access to, among other databases, state motor vehicle records, driver's license records,

the statewide "wants and warrants" database, and the Utah Uninsured Motorist Identification

Database.  The information Deputy Taylor retrieved on the computer showed that the license

plate was registered to a 1976 Chevy pickup truck, that insurance information on the truck was

"not found," and that the last known date of insurance coverage was June 30, 2004.  The Deputy

interpreted that information to mean the truck's insurance coverage had just lapsed and the truck

was no longer insured.  He decided to stop the pickup truck to discuss the painted headlights and

to request proof of insurance.

All of this occurred while the stop light was red.  When the stop light turned green,

Deputy Taylor drove through the intersection, pulled to the right lane and let the pickup truck

pass him.  He then pulled behind the pickup truck and turned on his patrol car emergency lights,

indicating that he wanted the driver of the pickup truck to pull over and stop.  The driver of the

truck pulled over to the right side of the road and slowed down to about ten miles an hour, but he

did not stop immediately.  Instead, he drove the truck along the right side of the road "for a good

distance" (Tr. at 9) before he "turned into a parking lot, drove across the parking lot and came to

a stop."  (Id. at 9-10.)

Before the slow-moving truck came to a stop, while Deputy Taylor was following it, he

noticed that "the driver kept reaching down to his left.  I also noted the passenger had reached

3

down and then bent forward." (Tr. at 10.)  Deputy Taylor described these movements as "furtive," characterizing them as "movement[s] that I consider to be almost trying to be concealed." (Tr. at 12, 37.)  Later, when Deputy Taylor asked Mr. McClain about these movements and the delay in stopping, Mr. McClain said he was looking for the paperwork related to the truck and looking for a safe place to pull over.

Once the truck came to a complete stop in the parking lot, Deputy Taylor got out of his patrol car and went to the driver's side window.  The driver was Defendant Nicholas McClain. Deputy Taylor asked Mr. McClain for his driver's license, and registration and insurance information.  Mr. McClain gave his driver's license to Deputy Taylor but said he did not have the registration or insurance information in the truck.  He did, however, say that he just recently registered the vehicle and did have insurance, just no documentation of it.

All this time, Defendant John Coltrane Thompson was sitting in the passenger side of the truck.  Deputy Taylor noticed that he was not wearing a seatbelt, which is a traffic violation.  He asked Mr. Thompson for identification, and Mr. Thompson gave him an identification card. Both Defendants remained seated in the truck.  Deputy Taylor testified that he did not observe any weapons on either of the Defendants.

At this point, a Davis County sergeant (Sergeant Law) arrived and asked Deputy Taylor if he was all right.  Deputy Taylor said he was, but he requested that Sergeant Law stay because he was thinking of impounding the truck for lack of proof of insurance.  Sergeant Law stayed at the scene.

Deputy Taylor went back to his patrol car and ran a records check on Mr. McClain and Mr. Thompson, looking for valid driver's license information and whether there were any

4

outstanding wants and warrants on either individual.  No actionable information came up.[1]  But

Deputy Taylor told Sergeant Law he was going to talk to the driver about the headlights, lack of

insurance documentation, possible impoundment of the truck, and the "furtive movement" he had

seen when pulling the truck over.  At no time during the traffic stop did Deputy Taylor return Mr.

McClain's driver's license or Mr. Thompson's identification card.

      Deputy Taylor approached the driver's side of the truck and asked Mr. McClain to get out

of the truck.  Mr. McClain complied with Deputy Taylor's request and walked to the back of the

truck with Deputy Taylor.  Mr. Thompson was still sitting in the passenger side of the truck.

Deputy Taylor asked Mr. McClain if he had any weapons on him, and Mr. McClain said he did

not.  Deputy Taylor patted Mr. McClain down and did not find any weapons.  Deputy Taylor,

noting that Mr. Thompson was still in the truck, asked Mr. McClain whether there were any

weapons in the truck.  Mr McClain said there was a broken rifle in the truck.[2]  At that point,

Deputy Taylor looked up and saw Mr. Thompson sticking his head out the window of the truck

listening to the conversation between Mr. McClain and Deputy Taylor.  Deputy Taylor told Mr.

Thompson to raise his hands and keep them up, which Mr. Thompson did.

      Deputy Taylor went back to questioning Mr. McClain about the movements he noticed

before the truck pulled to a stop.  He "also informed [Mr. McClain] that it had taken him an

awful long time to yield to [his] emergency lights." (Tr. at 13.)  Deputy Taylor told Mr. McClain

---

[1]Apparently, the inquiry showed that Mr. Thompson's driver's license was suspended, but because he was not driving, the information was of no relevance.

[2]Deputy Taylor initially testified that he did not find out until later that the rifle was broken.  (See Tr. at 13.)  But he soon corrected himself during his testimony at the evidentiary hearing.  (See id. at 14.)

"that those two facts together made [him] extremely nervous" and asked Mr. McClain whether

there were any other weapons, drugs, or alcohol in the truck and whether he was trying to hide

any of those things.  Mr. McClain said that there were no other weapons, drugs or alcohol in the

truck.  Deputy Taylor then asked Mr. McClain "if he minded if I looked in his vehicle to

ascertain and to make sure that none of those items were present. [Mr. McClain] stated that that

was fine and to go ahead." (Tr. at 14.)

Before Deputy Taylor searched the truck, he told Mr. Thompson to get out of the truck,

and Mr. Thompson complied.  Deputy Taylor testified that when he approached Mr. Thompson

on the passenger side of the truck (the door was open), he noticed "a milk carton in the glove

pouch of the seat and a butt of a weapon sticking out from underneath the passenger seat." (Tr.

at 14.)  The weapon Deputy Taylor saw was the broken rifle mentioned earlier by Mr. McClain.[3]

Deputy Taylor asked Mr. Thompson the same question about whether he had any weapons on

him.  Mr. Thompson said he did not.  Deputy Taylor patted him down but did not find any

weapons on Mr. Thompson.  Deputy Taylor also asked Mr. Thompson whether there were

weapons in the truck, and Mr. Thompson said a broken .22 caliber rifle was inside the truck.[4]  At

Deputy Taylor's direction, Mr. Thompson went to the back of the truck with Sergeant Law.

-------

[3]Later, Deputy Taylor learned that the broken rifle was stolen, but he did not have that
information until after he searched the truck and placed the Defendants in the patrol cars for
questioning.  (See Tr. at 17 (noting that, after Defendants were secured, Sergeant Law conducted
a query to determine whether the gun was legal, learned that the gun was stolen and, at some
point, told Deputy Taylor of the gun's status).)

[4]At one point during his testimony, Deputy Taylor said that Mr. Thompson volunteered
the information about the gun without being asked (see Tr. at 75), but other statements by Deputy
Taylor during the evidentiary hearing suggest to the court that Mr. Thompson provided the
information based on questions posed by Deputy Taylor.  (See, e.g., Tr. at 74-75.)

Deputy Taylor testified that he was concerned about a weapon in the truck because "all the movement that I'd seen prior to the traffic stop did not indicate they were looking for paperwork." (Tr. at 86.)

Deputy Taylor retrieved the gun from the truck and confirmed that it was broken. He asked Mr. Thompson whose gun it was. Mr. Thompson said it was his and that they were going to pawn it. Deputy Taylor then pulled the milk carton out of the truck, shook it, and opened it. It contained what appeared to Deputy Taylor, based on his experience and training, to be a glass methamphetamine pipe and two baggies of methamphetamine. He told Sergeant Law to handcuff one of the defendants and he handcuffed the other. He told the Defendants "they were not under arrest at that point but I was securing them for what I had found." (Tr. at 16.)

Deputy Taylor called another deputy sheriff to the scene, Deputy Brew,[5] with another patrol car. Each Defendant was placed in a patrol car. Deputy Taylor said the Defendants were placed in the patrol cars because it was hot outside and the cars were air conditioned. Deputy Taylor, Sergeant Law, and Deputy Brew were armed, but nothing in the record indicates that any of the officers drew his weapon at any time during the stop.

Deputy Taylor questioned each of the Defendants separately. First he approached Mr. McClain in his patrol car and recited Mr. McClain's *Miranda* rights. "Then I asked him if he understood. He stated that he did." (Tr. at 18.) He also asked if Mr. McClain was willing to talk to him at that time and Mr. McClain "stated that he would talk with me." (Tr. at 18.) Deputy Taylor questioned Mr. McClain. He also questioned Mr. Thompson after reciting the *Miranda*

---

[5]The transcript notes that Deputy's Brew's last name is spelled phonetically. (See Tr. at 70.)

warning to Mr. Thompson.[6]  After being read his *Miranda* rights, Mr. Thompson told Deputy

Taylor that he understood his rights and agreed to speak with Deputy Taylor at that time.[7]

Apparently Deputy Taylor told both of the Defendants that "the gun[] with the presence of the

drugs was a possible federal offense. . . . It was a serious problem." (Tr. at 81.)

    After Deputy Taylor interviewed both of the Defendants, the truck was impounded (that

is, it was towed away by a private towing company presumably on behalf of the Davis County

Sheriff's Department).  At some point before or during impoundment of the truck, Deputy Brew

took an inventory of the truck's contents.  Nothing in the record specifies the nature or extent of

the procedures followed to inventory and impound the truck.

## CONCLUSIONS OF LAW

    Mr. Thompson challenges the validity of the initial traffic stop.  Both Defendants

challenge the detention, the search, and the subsequent questioning of the Defendants during the

traffic stop.[8]

    In the Tenth Circuit, because a traffic stop is analogous to an investigatory detention, it is

analyzed under the principles of Terry v. Ohio, 392 U.S. 1 (1968).  United States v. Holt, 264

---

    [6]The Defendants emphasize the fact that only part of Deputy Taylor's conversations with
Mr. Thompson and Mr. McClain was recorded on audio tape.  In their argument, they suggest
that Deputy Taylor intentionally did not tape certain parts of his conversation with the
Defendants because he was making threatening, coercive statements intended to get them to talk.
In light of the contents of the testimony (see Tr. at 21 (Deputy Taylor's testimony as to why the
conversations were only partially recorded)) and the witness' demeanor, the court does not find
the Defendants' accusation persuasive.

    [7]Mr. Thompson emphasizes that Deputy Taylor did not ask him whether he wanted to
waive his rights.  (See Tr. at 82.)  The court does not find that fact significant.

    [8]The court finds that both Defendants have standing to assert their arguments.  See United
States v. Eylicio-Montoya, 70 F.3d 1158, 1162-64 (10th Cir. 1995).

F.3d 1215, 1220 (10th Cir. 2001) (en banc).  Accordingly, the court must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  Terry, 392 U.S. at 20.

**Was the traffic stop justified at its inception?**

As discussed further below, the court finds that the traffic stop was justified at its inception.  Accordingly, the government has satisfied the first prong of the Terry analysis.

Under the law of the Tenth Circuit, "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995); see also United States v. Ramstad, 308 F.3d 1139, 1144 n.1 (10th Cir. 2002) (lesser standard of reasonable suspicion, rather than the stricter standard of probable cause, is sufficient to justify a traffic stop).

The standard for evaluating whether an officer has reasonable suspicion of illegal activity is an objective one.  See, e.g., United States v. Villa-Chaparro, 115 F.3d 797, 802 (10th Cir. 1997).  The determination is to be made on the totality of the circumstances.  United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998).  By definition, the totality of the circumstances includes all circumstances known to the officer at the time, as well as reasonable inferences and conclusions that may be drawn by the officer.  Moreover, in determining reasonableness, the officer's conduct should be viewed with "'common sense' considering 'ordinary human experience,'" Villa-Chaparro, 115 F.3d at 801  (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)), an approach "intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer

9

to distinguish between innocent and suspicious actions." Id. (quoting United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995)); see also United States v. Arvizu, 534 U.S. 266, 273 (2002) (totality of the circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them").

The initial question here is whether Deputy Taylor observed a traffic or equipment violation or had reasonable suspicion to believe that a traffic or equipment violation had occurred or was occurring before he pulled the truck over. More specifically, did Deputy Taylor's observation of the spray-painted headlights and information that a record of insurance for the truck was "not found" pursuant to his inquiry on the Utah Uninsured Motorist Identification Database provide an objective legal basis for pulling the truck over.

Mr. Thompson argues that no traffic violation occurred because the spray-painted headlights did not present a safety concern at the time of the stop (that is, the stop occurred on a summer afternoon and there is no requirement, nor was there a need, to use the headlights during daylight hours). He also contends Deputy Taylor's use of the Utah Uninsured Motorist Identification Database was improper because it was not a reliable source of information to conclude that the truck was uninsured. The court disagrees and finds that Deputy Taylor's initiation of a traffic stop of the Defendants was valid under the Fourth Amendment.

In Utah, it is (and was at the time of the stop) a misdemeanor "for any person to drive . . . any vehicle . . . which . . . is not at all times equipped with lamps and other equipment in proper condition and adjustment as required." Utah Code Ann. § 41-6-117(1) (2004) (emphasis added). Also, failure to properly insure a motor vehicle being driven on the road is (and was at the time

of the stop) a criminal offense.  Utah Code Ann. §§ 41-12a-103(9), 41-12a-301(2), 41-12a-302(1) (2004).  Deputy Taylor had reasonable suspicion to believe that both of those statutory provisions had been violated by the driver of the truck.

First, Deputy Taylor testified that he believed the paint would interfere with the functioning of the truck's headlights.  The statute provides that the equipment must be in working order "at all times."  The fact that he observed the safety violation during daylight hours does not diminish his reasonable belief that the equipment safety law was being violated.  He reasonably determined that the condition of the headlights would interfere with their operation at night.  He was not required to wait until nightfall to make his determination by observing the headlights in use.  His conclusion was based on common sense and experience and was supported by the language of the statute requiring that the equipment be in working order "at all times."  His observation of the equipment violation was sufficient in and of itself to justify the traffic stop.

Second, Deputy Taylor had independent reason to pull the truck over because he had reasonable suspicion that the driver was driving the truck without insurance in violation of Utah law.  The basis for Deputy Taylor's belief was the result of an inquiry he made to the Utah Uninsured Motorist Identification Database, which, based on entry of the truck's license plate number, indicated that insurance for that truck was "not found."  The court rejects Mr. Thompson's argument that Deputy Taylor's reliance on the database was improper.  The phrase "not found" could indicate one of two things: that the truck was not insured or that the truck was insured but proof of insurance had not yet been entered into the database.  It is unreasonable to require the officer to speculate which situation is actually occurring.  The reasonable suspicion

11

standard does not require that the officer always be correct.  Rather, it requires that the officer's belief and actions be reasonable under the totality of the circumstances.  United States v. Tibbetts, 396 F.3d 1132, 1138 (10th Cir. 2005); United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. Cir. 2004) (citing United States v. Arvizu, 534 U.S. 266, 277-78 (2002)) ("[R]easonable suspicion may rely on information less reliable than that required to show probable cause and it need not be correct.") (internal citations omitted).  Deputy Taylor's reliance on the information obtained from the database was reasonable.[9]  He had a valid basis to stop the truck.

But this does not end the inquiry.  To prevail, the government must show that the continued detention of the Defendants was reasonable given the totality of the circumstances.  See Terry, 392 U.S. at 20.

**Was the continued detention lawful?**

As discussed further below, the court finds that the detention of the Defendants exceeded the scope of the initial stop.  Specifically, the court finds that Deputy Taylor did not have reasonable articulable suspicion of criminal activity (beyond the safety and insurance violations) that justified the continued detention of the Defendants.  Accordingly, the court holds that the detention of the Defendants beyond Mr. McClain's response to Deputy Taylor's initial question about weapons in the truck was unlawful.  Evidence obtained as a result of that unlawful detention must be suppressed as fruit of the poisonous tree.  Furthermore, the government has

---

[9]Mr. Thompson essentially contends that members of law enforcement in Utah should not be allowed *per se* to use the Utah Uninsured Motorist Identification Database to establish the basis for a traffic stop.  (See Def. Thompson's Mot. To Exclude Use of Data from the Uninsured Motorist Identification Database Program at 4-5.)  This issue is beyond the scope of the issues that must be decided by the court.

failed to meet its burden under the doctrine of inevitable discovery, so the evidence of the gun

and drugs is not admissible under that theory.

The court must assess the reasonableness of the traffic stop (which is a seizure under the

Fourth Amendment) "by considering the scope of the officer's actions and balancing the

motorist's legitimate expectation of privacy against the government's law-enforcement-related

interests." Holt, 264 F.3d at 1220.  Generally, in a routine traffic stop, an officer may detain

persons for only as long as it takes to request an operator's license and vehicle registration, run

required computer checks, and issue a citation.  See, e.g., United States v. Martinez, 983 F.2d

968, 974 (10th Cir. 1992) (citing United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir 1988),

overruled on other grounds, United States v. Botero-Ospina, 71 F.3d 783 (10th Cir. 1995)).  It is

undisputed that "an officer may ask questions relating to the reason for the stop." Holt, 264 F.3d

at 1221. It is also undisputed that the officer may, without any reasonable suspicion, ask whether

the vehicle has any loaded weapons in it.  Id. at 1217-18.

But other questioning that does not relate to the initial reasons for the stop is only

permissible under two circumstances.  "First, if the officer has an objectively reasonable and

articulable suspicion that illegal activity has occurred or is occurring, the officer may detain the

driver for questioning unrelated to the purpose of the initial traffic stop.  Second, if the traffic

stop has become a consensual encounter, the officer may continue to question the driver."

United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001).  See also United States v. Oliver,

363 F.3d 1061, 1066 (10th Cir. 2004) ("When questioning prolongs the detention, the

prolongation in itself constitutes a seizure under the Fourth Amendment, so we have repeatedly

held that the questioning must be supported by at least reasonable suspicion.");  Holt, 264 F.3d at

1221 ("Further delay is justified only if the officer has reasonable suspicion of illegal activity or if the encounter has become consensual.").

### The encounter between Deputy Taylor and the Defendants was not consensual.

In the Tenth Circuit, as a matter of law, if the officer does not return the person's documentation (e.g., driver's license and registration), the detention is not over and the encounter is not consensual. See United States v. Mendez, 118 F.3d 1426, 1430-31 (10th Cir. 1997). It is undisputed that Deputy Taylor did not return the driver's license and identification papers to Mr. McClain or Mr. Thompson at any time during the traffic stop. Accordingly, the court finds, as a matter of law, that the encounter between Deputy Taylor and the Defendants was not consensual.

Clearly, the detention in this case (a non-consensual encounter) lasted longer than it took Deputy Taylor to request the driver's license, vehicle registration, and insurance information, run the required computer checks, and issue a citation. The fact that he may have impounded the truck based on lack of proof of insurance does not justify further detention of the individuals. Accordingly, the government must establish that Deputy Taylor had reasonable and articulable suspicion that the Defendants were engaged in illegal activity in order to justify the prolonged detention, the pat-down, and the continued questioning of the Defendants. Moreover, the consent to search the truck is in question because of the illegal detention.

### Deputy Taylor did not have reasonable suspicion that a crime (other than those justifying the initial stop) was occurring.

The government bears the burden of showing that the seizure of Mr. McClain and Mr. Thomas "was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." Florida v. Royer, 460 U.S. 491, 500 (1983), quoted in United States v.

14

Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir.1994).

The government contends that the Defendants' "furtive movements" in combination with Mr. McClain's failure to stop immediately upon Deputy Taylor's signal is sufficient to establish reasonable suspicion that a crime was being committed. The government cites to these circumstances in an attempt to justify Deputy Taylor's pat-down of the Defendants and questioning of the Defendants regarding topics (including Deputy Taylor's request for consent to search the truck) other than the safety violation, insurance violation, and existence of loaded weapons in the truck.

The court finds that the circumstances cited by the government are not sufficient to establish an objectively reasonable and articulable suspicion of criminal activity. The court also finds that the information received by Deputy Taylor from Mr. McClain about the existence of a broken rifle in the cab of the truck did not, either by itself or in combination with the other events, create an objectively reasonable and articulable suspicion of a crime being committed. There is nothing in the record to support an objective conclusion that Mr. McClain's admission of the presence of a broken rifle in the truck was sufficient to justify further questioning on matters unrelated to the reasons for the initial stop or matters related to protection of officer safety. Indeed, there is no evidence in the record that Deputy Taylor detained the Defendants to check the status of the gun. Nor does the government offer that as a justification for the continuing detention. The existence of a broken rifle in a car is not in and of itself a crime,[10]

---

[10]During the hearing, Deputy Taylor testified during cross-examination as follows:

Q    Well, isn't it true that there was nothing illegal about the presence of the gun in
     the vehicle?
A    At that point?

15

does not signify a threat to officer safety, and would not give an officer justification to pursue an investigation into the existence of contraband in the truck or on the person of the Defendants. And yet that is what Deputy Taylor did. Once the concerns relating to the initial stop have been dispelled, the officer may only continue the detention if it is supported by a reasonable suspicion of criminal activity. United States v. Soto-Cervantes, 138 F.3d 1319, 1322 (10th Cir. 1998) ("In other words, [at that point] reasonable suspicion must exist at all [further] stages of the detention, although it need not be based on the same facts throughout.").

When Deputy Taylor proceeded to pat down each of the Defendants,[11] ask them further questions about the rifle and other contents of the truck (before or after administering the Miranda warning to the Defendants), and ask for consent to search the truck, he went too far. Evidence that is obtained as the result of an illegal detention must be suppressed as fruit of the poisonous tree. E.g., United States v. Villa-Chaparro, 115 F.3d 797, 800 n.1 (10th Cir. 1997);

----

| | |
|---|---|
| Q | That's correct. |
| A | No. |
| Q | You didn't know of any crime being committed? |
| A | No. |
| Q | So you had Mr. Thompson get out of the vehicle? |
| A | I had suspicion of a crime being committed. Anytime there's a gun present in a vehicle, it's going to be investigated by a police officer. If you don't have – if you don't have a – |
| Q | Let me ask you this question. Is it your testimony that if there is a gun in a vehicle, a law enforcement officer will search that vehicle – |
| A | No. They – |
| Q | – based on the presence of that gun alone? |
| A | I didn't say search. |

(Tr. at 67-68.)

[11]Although the court finds the pat-down of the Defendants problematic, that point is moot because no evidence, incriminating or otherwise, was obtained through the pat-down.

16

United States v. Park-Swallow, 105 F. Supp. 2d 1211, 1215 (D. Kan. 2000) (citing United States v. Miller, 84 F.3d 1244, 1250 (10th Cir. 1996)).

> **Mr. McClain's consent to search the truck was not voluntary under the circumstances of an illegal detention.**

It is possible that a consent to search following an illegal detention may be found voluntary (and the search valid), but the government's burden is high. See United States v. Fernandez, 18 F.3d 874, 881 (10th Cir. 1994) ("The government bears the burden of proving the voluntariness of consent, and that burden is heavier when consent is given after an illegal stop.") (internal citations omitted). "The government must establish that [the defendant's] consent to search is 'sufficiently an act of free will to purge the primary taint of the illegal [seizure], [or] it must be suppressed as fruit of the poisonous tree.'" Id. In other words, "the government must prove not only the voluntariness of the consent under the totality of the circumstances, but the government must also 'establish a break in the causal connection between the illegality and the evidence thereby obtained.'" United States v. Melendez-Garcia, 28 F.3d 1046, 1054 (10th Cir. 1994) (internal citations omitted).

When making a determination about the voluntariness of the consent to search, the court must consider three factors articulated in Brown v. Illinois, 422 U.S. 590 (1975). United States v. Maez, 872 F.2d 1444, 1454 (10th Cir. 1989). The factors include "(1) the temporal proximity of the illegal detention and consent, (2) any intervening circumstances, and (3) the purpose and flagrancy of any official misconduct." United States v. Caro, 248 F.3d 1240, 1247 (10th Cir. 2001).

The government has not satisfied its burden of showing that the consent was sufficiently

17

removed of the taint of the illegal detention. First, Deputy Taylor never returned the identification papers to the Defendants. <u>See, e.g.</u>, <u>United States v. Caro</u>, 248 F.3d 1240, 1247 (10th Cir. 2001) (applying the factors of <u>Brown</u>, the court found that consent to search was not purged of the taint of the preceding illegal detention because, among other things, the trooper was still in possession of the driver's license, vehicle registration, and citation for excessive window tint when the alleged consent was given). Second, there was no lapse of time or other intervening circumstance between the illegal detention and the alleged consent to search the truck – that is, Deputy Taylor went straight from asking about weapons to asking whether he could search the car to determine that there were no weapons, drugs, or alcohol in the truck. <u>See id.</u> (taint not removed because, in part, no time between the Fourth Amendment violation and the alleged consent had lapsed, and no intervening circumstances broke the causal connection between the illegal detention and alleged consent). Third, at the hearing and in the government's brief, the government contended that Deputy Taylor was acting out of a concern for his safety. But the lack of urgency demonstrated in the record (<u>e.g.</u>, Deputy Taylor's delay in asking about weapons) and the information he had (<u>e.g.</u>, the rifle was broken, the Defendants' presence and actions were not, according to the record, threatening, and no weapons were observed or found on the Defendants' persons) belies the government's suggestion that Deputy Taylor was concerned about his personal safety at the point when he began questioning the Defendants about subjects other than the safety and insurance violation and when he asked for consent to search the truck. Under the circumstances, the court finds that Mr. McClain's alleged consent to search the truck was not sufficiently purged of the taint of the illegal detention.

**The Government has not met its burden under the inevitable discovery rule.**

Under the inevitable discovery rule, the government may successfully defend against a motion to suppress if "the evidence in question would inevitably have been discovered without reference to the police error or misconduct." Eylicio-Montoya, 70 F.3d at 1165 (quoting Nix v. Williams, 467 U.S. 431, 448 (1984)).

Here, the government argues that the truck, without proof of insurance, would have been impounded and the contents of the truck, including the gun and drugs, would have been discovered during an inventory of the truck. But the government has not satisfied its burden. First, the government never established that the truck would indeed have been impounded. Deputy Taylor never made a decision, much less did he receive authorization to have the truck impounded for the insurance violation, and the record suggests that impoundment was somewhat discretionary. Second, the record is devoid of information regarding the procedures that presumably would have been followed if the truck had been impounded for an insurance violation. In an analogous case, United States v. Mikulski, 139 F. Supp. 2d 1204 (D. Utah 2001), where a truck had actually been seized, impounded, and inventoried, the court articulated the burden the government must meet:

> [W]here defendant has challenged the search and seizure of items from his truck, as violative of the Fourth Amendment, the burden is on the government to prove that the warrantless search falls within the 'inventory search' exception. United States v. Ibarra, 955 F.2d 1405, 1408 (10th Cir. 1992); United States v. Carreon, 872 F.2d 1436, 1441 (10th Cir. 1989). Thus, the primary issues before the court are: (1) Whether the government has demonstrated that there was adequate justification for the impoundment of defendant's truck and (2) Whether the government has shown that the inventory search was conducted pursuant to established departmental procedures of government inventory searches of impounded vehicles.

139 F. Supp. at 1218.  Here, the government did not present evidence of what impoundment procedures would have been followed or how the officers would have searched inside the truck. Without some showing on this issue, the court may not find that the evidence would have been inevitably discovered.

### ORDER

For the foregoing reasons, the Defendants' motions to suppress the evidence are GRANTED, with the exception of Mr. Thompson's Motion to Exclude Use of Data From the Uninsured Motorist Identification Database Program, which is DENIED.  Specifically, the evidence of the gun in the truck, the gun's status, the drugs, and the Defendants' statements made after Deputy Taylor received Mr. McClain's answer to Deputy's Taylor's question of whether there were weapons in the car is suppressed.

IT IS SO ORDERED this _12_ day of May, 2005.

BY THE COURT:

_Tena Campbell_

TENA CAMPBELL
United States District Judge